AUSA:    Yasmine Moore            Telephone:  (313) 226-9100
AO 91 (Rev. 11/11)  Criminal Complaint     Special Agent:    Elizabeth Messenger     Telephone:  (313) 202-3400

# UNITED STATES DISTRICT COURT

for the

## Eastern District of Michigan

United States of America
    v.

D-1 Amaria HIXON, and

D-2 Armeka THOMAS

Case: 2:23−mj−30400
Assigned To : Unassigned
Assign. Date : 10/2/2023
CMP: SEALED MATTER (MAW)

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____09/25/2020 through 11/2/2021_____ in the county of _Washtenaw & eleswhere_ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1028A | Aggravated identity theft |
| 18 U.S.C. 1349 | Conspiracy to commit wire fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Elizabeth Messenger_
_Complainant's signature_

  Special Agent  Elizabeth Messenger - Dept of Labor - OIG
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: ___October 2, 2023___

_Elizabeth A. Stafford_
_Judge's signature_

City and state:  _Detroit, Michigan_

  Honorable Elizabth Stafford,  U.S. Magistrate Judge
_Printed name and title_

## Affidavit in Support of Criminal Complaint

I, Elizabeth Messenger, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1.      I am a Special Agent of the U.S. Department of Labor, Office of Inspector General, Office of Investigations – Labor Racketeering and Fraud (**DOL-OIG/OI-LRF**) and have been so employed since September of 2022.  I am currently assigned to the Detroit Field Office of DOL-OIG.  Prior to this assignment, I was an Investigator of the U.S. Department of Labor, Office of Labor Management Standards (**DOL-OLMS**) for six years.  In that capacity, I conducted complex criminal and civil investigations involving violations of federal law as it pertains to labor organizations including the embezzlement of union funds and violations occurring in the course and conduct of union officer elections.  In both my current and former positions, I participated in joint investigations concerning violations of law relating to financial crimes and unemployment insurance fraud schemes with other state and federal investigators.  I have also executed search warrants related to these violations.  I have additional experience and training from the Federal Law Enforcement Training Center (**FLETC**) where I graduated from the Criminal Investigator Training Program (**CITP**).  I am an "investigative or law enforcement officer" of the United States within the meaning of Title 5, U.S.C. § 8401(17)(A)(i)(I).

1

2.     As a Special Agent at the Department of Labor, I have conducted investigations into criminal violations of Title 29 and Title 18 of the United States Code.  During this time, I have become familiar with and worked with special agents who have over 20 years of law enforcement experience investigating criminal schemes targeting the State of Michigan's Unemployment Insurance Agency (**SOM-UIA**) through the filing of false or fictitious unemployment insurance claims.  Based on my direct personal experience with these cases and through interaction with seasoned agents, I have become familiar with the methods that criminals use to attack and exploit the unemployment insurance systems as well as tools and methods criminals often utilize to facilitate that fraud.  More recently, this type of fraud surrounds Pandemic Unemployment Assistance (**PUA**) claims that are a type of unemployment insurance claim.

3.     I make this affidavit based upon personal involvement in the subject criminal investigation, including the review of financial, employment, internet service provider, and utility and property records; records from the SOM regarding unemployment insurance claims; law enforcement surveillances; and review of information and evidence obtained during the investigation of an unemployment insurance fraud scheme operating in Ypsilanti, MI.  I have also been provided with information from other law enforcement agents and officials from the Federal Bureau of Investigation (**FBI**) and State of Michigan's Fraud and Investigation

2

Unit (**SOM-FIU**).  This affidavit does not contain all of the facts developed to date in the underlying investigation and is being submitted for the purpose of establishing that AMARIA HIXON (**HIXON**) and ARMEKA THOMAS (**THOMAS**) have committed wire fraud (18 U.S.C. § 1343), aggravated identity theft (18 U.S.C. § 1028A), and conspiracy to commit these crimes (18 U.S.C. § 1349).

## Summary of the Investigation

4.    This investigation is focused on a PUA fraud conspiracy committed by SOM contracted employee **HIXON** and co-conspirator **THOMAS**, also known as Orvin Hambright and "Markey" (nickname).  **HIXON** was an Unemployment Insurance Examiner (UIE) in the SOM-UIA's Customer Service Department, contracted through Robert Half International, beginning July 24, 2020, until June 9, 2021. As an UIE, **HIXON** was responsible for answering telephone calls, questions, and filing PUA claims.  The investigation revealed that between September 2020 and June 2021, **HIXON** utilized two distinct residential Internet Protocol (**IP**) addresses to access PUA and UIA claims.  These two IP addresses accessed 53 individual claims, 19 of which resulted in the outlay of approximately $300,000 in federal funds earmarked for PUA and UIA benefit payments through interstate wire transfers.  Records from the SOM show that **HIXON** accessed all of the aforementioned 19 claims and improperly altered and authorized payment on

3

them.  Furthermore, the investigation has shown that **HIXON** was the subscriber of at least one of the foregoing IP addresses associated with the payment of claims totaling $104,897.75.  Additionally, more than $170,000 of the UI payments were deposited into a bank account associated with **HIXON**.  Information provided by SOM indicates that **HIXON** had no legitimate reason to access, modify, or approve the subject claims.  According to SOM-FIU, **HIXON** used her position as a contracted employee to inappropriately access and wrongfully release the claims tied to the two IP addresses.  Finally, the investigation disclosed that **THOMAS** accessed his claim with the SOM using the IP address of which **HIXON** was the subscriber.  **THOMAS** was also captured in ATM footage withdrawing money from the aforementioned account to which over $170,000 in UI benefits were paid.

## Unemployment Insurance Background & COVID-19

5.      The Social Security Act of 1935 initiated the federal and state unemployment insurance system.  The system provides benefits to individuals who are unemployed.  The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment.  In the state of Michigan, the UI system is administered by the SOM-UIA.

6.     As a result of the COVID-19 pandemic, beginning in or about March 2020 and continuing through the present, the U.S. Government provided federal funds to the states, including the state of Michigan, to supplement unemployment benefits through multiple government programs.  Those government programs include, but are not limited to, the Families First Coronavirus Response Act (**FFCRA**); Coronavirus Aid, Relief, and Economic Security (**CARES**) Act; American Rescue Plan Act of 2021 (**ARPA**); and Lost Wages Assistance Program (**LWAP**).

7.     Normally, in the absence of fraud, an individual initiates an unemployment claim (**UI claim**) by submitting a claim in person, over the telephone, or on the internet through the State Workforce Agency (SWA) website. In order to qualify for UI benefits, the claimant must demonstrate a certain level of earnings in several quarters immediately preceding the application.  The amount of unemployment benefits the UI claimant qualifies for depends on a variety of factors, including but not limited to, the length of his or her previous employment and the amount of wages he or she earned.

8.     The SWA will approve or reject a UI claim based on the application and information provided by the claimant.  If the SWA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet at various

times throughout the claim process.  The claimant must also certify that he or she is still unemployed and actively seeking work.

9.      Some claims have multiple weeks of payments pending certification and amount to larger sums. Those claims are labeled under 'Benefit Payment Review' and require a manager's review and approval for the payments to be released.

10.     Once an application is approved, the SOM provides unemployment benefits through two financial means: 1) a Bank of America (**BOA**) issued debit card is mailed to the claimant through the U.S. Postal Service, or 2) the claimant provides a bank account number where the benefits are directly deposited through electronic fund transfers (**EFTs**).   The EFTs originate from one or more accounts maintained by the Michigan Unemployment Insurance Agency (**MUIA**) at BOA. BOA is a financial institution as defined by 18 U.S.C. § 20.

11.     All EFTs of unemployment insurance benefits to Michigan unemployment insurance claimants, whether through a debit card or bank account, involve interstate wire communications through the transmission of electronic signals from BOA's two data centers located in Virginia and Colorado.

## Unemployment Insurance & Fraud Prevention

12.     In an effort to prevent and otherwise inhibit fraud, the SWA website captures certain data surrounding the interaction between an individual and the UI

system.  Each SWA has its own unique system.  The SOM-UIA uses the Michigan

Integrated Data Automated System (**MiDAS**).  Each time a claim is accessed,

MiDAS creates a digital footprint by collecting data including dates, times, IP

addresses, and Media Access Control (**MAC**) addresses associated with a device

accessing a claim.  The SWA and SOM systems tie this information to the user-

entered information captured to facilitate the claim (i.e. name, address, social

security number, BOA or other bank account numbers, bank routing numbers,

etc.).  It is through the analysis of this data that the SWAs and investigating agents

can identify fraudulent trends and tendencies associated with certain claims.

13.     MiDAS also utilizes certain proprietary algorithms that automatically

identify and stop possible fraud based on whether or not a claim exhibits fraudulent

indicators that exceed a designated threshold.  Furthermore, humans who review

claims can also take actions to stop payments of claims should they conclude that

the payments may be involved in fraud.

14.     In an effort to prevent internal misconduct including fraud, SOM-UIA

also captures internal data surrounding the interactions between SOM employees,

contractors, and consultants through MiDAS.  MiDAS maintains an "**audit trail**,"

which identifies any employee who touches, alters, or otherwise modifies a claim.

An employee is identified in MiDAS through their required unique credentials or

username.  The SOM maintains workflow logs of each employee that note which

7

claims are assigned to a particular employee.  The SOM also maintains call logs that document telephonic contact between employees and claimants.  Those workflow logs and call logs detail whether employees had a legitimate reason to access or modify a claim.

15.     Investigators from the SOM-FIU have the ability to access and review the data maintained for both external actors and employees in MiDAS.  It is through the analysis of this data that investigating agents can identify fraudulent trends and tendencies associated with certain claims.

### SOM Contractor Amaria Hixon

16.     In October 2021, SOM-FIU began investigating a suspected PUA fraud scheme involving SOM contractor **HIXON**.  SOM-FIU investigators noticed several anomalies in **HIXON's** work activity including that many of the claims she was accessing were deemed "inactive" and not assigned work items.  Furthermore, **HIXON** was using her access to make changes to claimants' UI accounts with no evidence that **HIXON** had spoken with the claimant or that the claimant had contacted SOM-UIA.

17.     SOM-FIU linked the activity to **HIXON** through her unique Unemployment Insurance Examiner (UIE) username: "hixona" in SOM's MiDAS computer system.  SOM-FIU confirmed that **HIXON**'s log-in credentials are unique to her and no other SOM employee is provided with the same username.

18.     SOM-FIU detailed that **HIXON** was contracted in July 2020 to work for the SOM-UIA as a UIE in the Customer Service Department in response to the influx of PUA claims during the COVID-19 pandemic.  According to the Michigan Civil Service Commission Job Specification listed on the State of Michigan's website, a UIE services claimants, employers, and the general public regarding the SOM's UI programs.  SOM officials further detailed that UIE's are responsible for answering phone calls and questions, and filing PUA claims.

19.     SOM officials confirmed that Robert Half employees, like **HIXON**, were not responsible for reviewing, approving, or adjudicating claims; resolving UI claimant social security identification verification issues; resolving benefit payment control availability issues; nor facilitating payment on benefit payment reviews or refunds.  Robert Half Employees had the access and ability to discard fraud investigations, but should not have done so as it is not within the scope of their duties.  Robert Half employees were to only change certifications on PUA claims if information was incorrect or made in error.  Robert Half employees were not to change information on MiWAM accounts, such as disassociating users.

20.     At the time of this application, **HIXON** is no longer contracted by the SOM by Robert Half International.  **HIXON**'s employment with Robert Half International ended on June 9, 2021.

9

21.     SOM-FIU investigators received a report from the Department of Technology, Management, and Budget (**DTMB**), listing IP .183 and IP .121 as the IP addresses used by **HIXON** while working remotely.  More specifically, the DTMB report documents that from August 28, 2020 through December 2, 2020, **HIXON** utilized IP .121 to access SOM's Virtual Private Network (VPN). Beginning December 4, 2020 through the end of her employment, **HIXON** primarily utilized IP .183 to access SOM's VPN.

22.     SOM-FIU investigators reviewed **HIXON's** activity in MiDAS through her unique UIE credentials and username, "hixona".  The review determined that between September 2020 and June 2021, **HIXON** electronically accessed, altered, and approved 19 claims outside of the scope of her duties and responsibilities, as previously described above.  The unauthorized approval of these claims resulted in the illegitimate outlay of over $300,000 in PUA and UIA funds.

23.     Moreover, the SOM-FIU provided selections of **HIXON's** activity in MiDAS that show several instances in which **HIXON** searched for inactive accounts.  On at least 32 claimant accounts, **HIXON** disassociated the original MiLogin usernames and created new MiLogin usernames for those same accounts. Moreover, **HIXON** changed bank account information on at least 22 accounts, backdated claims on 10 accounts, and discarded fraud investigations on 3 accounts.

SOM-FIU reported that while Robert Half employees have the ability and access to discard fraud investigations, only regulation agents within their unit have the authority to do so.

24.     As detailed below, agents obtained records from Comcast which identified **HIXON** as the owner of IP .183.  Agents also discovered that **THOMAS** filed his SOM UI claim, and continued to access that claim, using IP .183.  Additionally, agents obtained bank records for **THOMAS**, which confirmed **THOMAS** regularly accessed his bank account using IP .183.  **THOMAS'** bank records also document Zelle payments from **HIXON** to **THOMAS**, which showed the two had some type of relationship.

### **Probable Cause**

### **IP .183**

25.     SOM-FIU investigators obtained records from Comcast that disclosed that IP .183 was a dynamic IP address assigned to the residence located at XXXX Foxthorn Drive, Canton, Mi 48187, beginning December 3, 2020.  Comcast records also showed that the account was held in the name of **AMARIA HIXON** with a contact phone number of XXX-XXX-8685.  Comcast records listed the billing address for IP .183 as XXXX S. Mohawk Ave., Ypsilanti, MI 48197.

26.     Agents obtained DTE records for **AMARIA HIXON**, which confirmed **HIXON** has an active account for residential electric and gas service at

11

XXXX S. Mohawk Ave., Ypsilanti, MI 48197, and has so since November 23, 2021. From December 2, 2020 through November 20, 2021, **HIXON** had residential electric and gas service at XXXX Foxthorn Dr., Canton, MI 48187, which is the time period IP .183 was assigned to **HIXON** at that same residence. DTE records further showed that **HIXON** had residential electric service from March 17, 2019 through December 2, 2020 at XXX Washtenaw Rd., Apt. X, Ypsilanti, MI 48197.

27.    MiDAS records showed that "hixona" accessed and adjusted over 32 claims, resulting in the payment of 9 claims totaling $104,897.95 of the $304,043.19 referenced above. As previously stated, the SOM-FIU has reviewed **HIXON's** assigned work items and has detailed that **HIXON** had no legitimate reason to access, let alone approve, the claims. As indicated above, common judgement suggests that this level of activity originating from a single residence is alone indicative of fraud.

28.    MiDAS records show that **THOMAS'** UIA claim was also accessed using IP. 183. **THOMAS** listed XXXX Ridgeview, Ypsilanti, MI 48198 as his address on his SOM-UIA claim. SOM-FIU investigators confirmed that **THOMAS** has not accessed his SOM-UIA claim since February 2022.

29.    SOM-FIU investigators identified **THOMAS'** bank account (**ACCOUNT 3374**) at JP Morgan Chase Bank through his UIA claim with the

SOM.  SOM-FIU investigators obtained bank records for **THOMAS' ACCOUNT 3374** for the period beginning April 16, 2021 through October 18, 2021.  JP Morgan Chase Bank provided a report documenting IP addresses used by **THOMAS** during that period to access his online bank account.  **THOMAS** used IP. 183 to access his account from May 1, 2021 through October 3, 2021.

### Account 8788

30.     As previously stated, Account 8788, held at JP Morgan Chase Bank, received more than $170,000 of the approximately $300,000 in UI benefit payments disbursed from the 19 claims accessed and altered by **HIXON**.  SOM-FIU issued a subpoena to JP Morgan Chase Bank for Account 8788 information, which revealed the account was opened on September 28, 2020, in the name of P.B., with a personal address of XXX Washtenaw Rd., Apt. X, Ypsilanti, MI 48197 and telephone number XXX-XXX-5618.  P.B. had an inactive claim account with the SOM that was accessed and altered by **HIXON**, as further described below.

31.     Account 8788 bank records show that $172,379.55 in UI benefits were deposited into the account beginning on October 1, 2020.  The last UI benefit deposit was made on May 27, 2021, and the account remained open until the account was closed and drained of funds on January 18, 2022.  Bank statements

document $172,949 in ATM cash withdrawals, with the first withdrawal made on October 2, 2020, and the final withdrawal made on November 2, 2021.

32.     The address listed on Account 8788 is **HIXON**'s address on her driver's license during the same time period, as well as the residence where she had residential electric service with DTE from March 17, 2019 through December 2, 2020.  The telephone number listed on the bank account was used on **HIXON**'s MiWAM account on August 5, 2020.

33.     P.B., who is the named account holder for Account 8788, also had a SOM-UIA claim.   MiDAS records documented that **HIXON** accessed P.B.'s claim, using both IP .121 and IP .183, 402 times over the course of 18 days.  While on P.B.'s account, **HIXON** created a new MiLogin user associated with the account and changed the bank account to Account 8788.  As a result, $18,240 was paid to Account 8788.

34.     SOM-FIU investigators obtained ATM footage for Account 8788 from JP Morgan Chase Bank, which captured an individual who investigators believe is **THOMAS**, withdrawing cash on at least 13 occasions from Account 8788.



(**THOMAS**, Chase ATM Footage 9.30.2021, $1,000 withdrawal)



(**THOMAS**, Chase ATM Footage, October 9, 2021)

15



(**THOMAS**, Chase ATM Footage, $1,000 Cash Withdrawal, October 9, 2021)



(**THOMAS**, Chase ATM Footage, October 10, 2021)

16



(**THOMAS**, Chase ATM Footage, $1,000 Cash Withdrawal, October 10, 2021)

35.     SOM-FIU investigators believe the individual in the ATM footage is **THOMAS** because **THOMAS** also accessed his SOM UIA claim using IP .183. Investigators also believe **THOMAS** matches the description of the individual seen withdrawing money from Account 8788 based on the Michigan driver's license **THOMAS** submitted to SOM for his UIA claim, as well as photos obtained from OTIS and SNAP.



(**THOMAS'** Michigan Driver's License)



(**THOMAS** photo image, OTIS)



(**THOMAS** photo image, SNAP)

36.     Agents conducted a search of social media and found **THOMAS'**

Facebook account under the name, 'MD PESOS'.  **THOMAS'** Facebook photo

matches the image of the individual captured in the ATM footage.



(**THOMAS**, Facebook Profile Picture and Cover Photo)

19



(**THOMAS**, Facebook, Profile Picture)

37.      Most of the ATM footage shows the individual driving a Dodge Ram

1500, License Plate XXXXXX.  Agents procured an image posted by **THOMAS**

on his Facebook account, which appears to be taken from inside a truck, matching

the interior of a Dodge Ram 1500.



(**THOMAS**, Facebook post, July 7, 2020)

20

38.     Agents searched the owner of the Dodge Ram 1500, with license plate XXXXXX, and found that the truck was registered to A.H.  Agents learned that A.H. has not been a resident of Michigan for several years; however, further investigation revealed his family owns a car rental business in Ypsilanti, Michigan, called Uncut Car Rental.  Uncut Car Rental posted a Dodge Ram 1500, matching the truck captured in ATM footage, available for rent on its Facebook page on June 20, 2020.



(Facebook, Uncut Car Rental, June 20, 2020)

39.     **THOMAS'** probation officer advised agents that **THOMAS** would be meeting with him on May 11, 2023 at the Michigan Department of Corrections located at 101 E. Huron St., Ann Arbor, MI between either 8:15am - 11:30am or 1:15pm - 4:30pm. An agent conducted surveillance of **THOMAS** on May 11, 2023 and observed him entering 101 E. Huron St. at 3:21pm.  Agent then observed

**THOMAS** leaving 101 E. Huron St. and leaving in a black Dodge Ram, with

Michigan license plate number XXXXXX.



(**THOMAS** leaving 101 E. Huron St. at 3:21pm)



(**THOMAS** entering black Dodge Ram 1500)



(Close-up photo of License Plate)

**Claimant P.B.**

40.     As previously stated, P.B. is the named account holder for Account

8788.  According to SOM records, **HIXON** first accessed P.B.'s claim on

September 28, 2020, the same day that Account 8788 was opened at JP Morgan

Chase Bank.  Later that same day, a new MiLogin user was created for P.B.'s

MiWAM account.  SOM records show that **HIXON** accessed P.B.'s account 402

times over the course of 18 days via IP .121 and IP .183.  While accessing the

account, **HIXON** changed the bank account information to Account 8788 and

manipulated the benefit payment review so the claim would be paid as a refund.

Because refunds require a note from the UIE in order for a payment to be released,

**HIXON** made a notation, ":P", on P.B.'s account.  Ultimately, $18,240 in UI

benefits for P.B's claim were paid to Account 8788.

**Claimant B.M.**

41.     According to SOM records, **HIXON** first accessed B.M.'s claimant

account on December 7, 2020.  That same day, a new MiLogin user was associated

to B.M.'s MiWAM account.  **HIXON** subsequently performed actions on the

account to facilitate UI benefit payments totaling $6,607.83.  SOM-FIU

investigators subpoenaed bank accounts associated with B.M.'s claim, including

two accounts held at Sutton Bank and three accounts held at JP Morgan Chase

Bank, one of which was Account 8788.

42.     Sutton Bank Account ending in 7386 (Account 7386) was held in B.M.'s name and address of XXX Washtenaw Ave., Apt. X, Ypsilanti, MI 48197, which is the same address associated with Account 8788 and **HIXON**'s residence around that same time.  UI benefits totaling $4,729.96 were successfully deposited to Account 7386, in the names of B.M., J.W., and M.C.  J.W. and M.C. also had UI claims with the SOM that were accessed and altered by **HIXON**, with payments made totaling $30,023 and $17,295.60, respectively.

43.     Sutton Bank Account ending in 9160 (Account 9160) and listed on B.M.'s UI claim, was held in G.N.'s name with address XXX Washtenaw Ave., Apt. X, Ypsilanti, MI 48197.  UI benefits totaling $2,379.23 were deposited to Account 9160 in the names of B.M., M.C. (accounted for above), T.D., and Y.A.  T.D. and Y.A. had claims with the SOM that were accessed and altered by **HIXON**, with payments made totaling $34,424 and $24,380, respectively.  G.N. had a claim with the SOM that was accessed and altered by **HIXON**; however, no payment was issued on the account due to an identity theft claim on the account.

44.     JP Morgan Chase Bank Account ending in 1564 (Account 1564) was opened on December 8, 2020, and held in B.M.'s name with address XXX Washtenaw Ave., Apt. X, Ypsilanti, MI 48197.  Bank records show that IP .183 accessed the account on December 8, 2020, December 9, 2020, December 10, 2020, December 11, 2020, and December 15, 2020.  Telephone number 313-424-

25

2217 was the telephone number associated with the Account 1564. Bank records show that between December 2020 and August 2021, $11,854.83 in UI benefits were deposited to Account 1564.

45. SOM-FIU investigators subpoenaed T-Mobile for telephone records associated with telephone number XXX-XXX-2217. T-Mobile records revealed **HIXON** was the subscriber of that telephone number from October 9, 2020, through December 23, 2021. **HIXON**'s address associated with the T-Mobile account was XXX Washtenaw Ave., Apt. X, Ypsilanti, MI 48197.

46. JP Morgan Chase Bank Account ending in 2356 (Account 2356) was opened on January 18, 2021 and held in the name of B.D. with address XXXXX Michigan Ave., Apt. X, Canton, MI 48188. Telephone number 313-424-2217 was the telephone number associated with Account 2356. Between January 2021 and March 2021, $27,936.60 in UI benefits were deposited to Account 2356. As stated above, telephone number XXX-XXX-2217 was **HIXON**'s telephone number during this time period.

47. **HIXON** had a 2016 Jeep Renegade registered to her from March 7, 2022 through November 12, 2022, at XXXXX Michigan Avenue, Canton, MI 48188 (no apartment number listed). The search also revealed Mario Hixon lived at XXXXX Michigan Ave, Apt. X, Canton, MI 48188, from approximately November 2012 through June 2022.

26

48.     Account 8788, held at JP Morgan Chase Bank, was also a bank account associated with B.M.'s claim.  Chase bank records do not list claimants' names in UI benefit deposit transactions; however, as previously stated, over $170,000 in UI benefits were deposited into Account 8788.

## Claimant D.V.

49.     According to SOM records, on January 21, 2021, **HIXON** accessed an inactive claimant account held in the name of D.V.  Approximately 15 minutes after **HIXON** initially accessed the account, a new MiLogin user was associated with the claimant account using IP .183.  MiDAS records confirm **HIXON** was on D.V.'s claimant account at the same time the new MiLogin user was associated with the account.  **HIXON** then acted on the account to facilitate a payment totaling $17,212 to bank accounts with Sutton Bank and Current Bank.  SOM-FIU investigators issued subpoenas for bank account information to accounts at Sutton Bank, Current Bank, and JP Morgan Chase Bank (Account 8788), which were listed bank accounts on D.V.'s UI claim.

50.     Sutton Bank records for account ending 5324 (Account 5323) revealed UI benefits totaling $1,342 were paid to a Sutton Bank card held in **HIXON**'s name.

**Claimant T.D.**

51.      On September 11, 2020, **HIXON** first accessed T.D.'s claim;

however, no action was taken.  On September 25, 2020, at 13:50, T.D.'s MiWAM

account was accessed and information was changed.  At 13:49:56, **HIXON** was on

T.D.'s claimant information tab in MiDAS, but did not "click" in the system again

until 13:58:59.  A claim was filed on T.D.'s account at 14:29:03.  At 16:14:17,

**HIXON** invalidated an "inactive claim" indicator on the account.  **HIXON** then

changed the certification begin date on the claim to June 7, 2020, and generated 15

weeks for certification and added the following note: "Clmt called in and he

entered his BYB date in added certifications."  MiWAM account captures and

MiDAS records show that IP .121 and "hixona" appear to be on T.D.'s account on

September 25, 2020, at the same time.  UI benefits totaling $34,424 were paid on

T.D.'s claim.

52.      SOM-FIU investigators subpoenaed Bancorp for bank account

information associated with T.D.'s claim.  Bancorp account ending in 0222

(Account 0222) show an initial deposit of $25 made on September 29, 2020 by

"Amaria Hixon."  Between September 30, 2020 and October 13, 2020, UI benefits

totaling $17,802 were deposited into the account in the names of P.S. and T.D.

P.S. had a UI claim with SOM that was accessed and altered by **HIXON**, resulting

in the payment of $19,140.

**Claimants T.H. & N.W.**

53.     On February 22, 2021, SOM records show that **HIXON** accessed an account held in the name of T.H.  At 15:55:39, **HIXON** changed the MiWAM account authentication to a new email address while using IP .183.  T.H.'s claim was re-opened and an additional claim was filed. Account 8788 was listed as an account on T.H.'s claim.  **HIXON** then facilitated a payment totaling $14,856.93. Similarly, on February 23, 2021, **HIXON** accessed an inactive claimant account held in the name of N.W.  After a couple of failed attempts to access the account, **HIXON** succeeded by changing the MiWAM account authentication email address while using IP .183.  A new claim was filed and **HIXON** facilitated a payment totaling $13,592.  Account 8788 was listed as an account on N.W.'s claim.

**Federal Search Warrants to be Executed**

54.     Federal Search Warrant Applications are to be filed concurrently with this application and executed simultaneously.

**Interstate Wire Transfers**

55.     I know that interstate wires are being used in the fraud scheme.  SOM-UIA utilizes accounts at Bank of America to process and make UI benefit payments.  Bank of America utilizes data centers in Virginia and Colorado to process all EFTs into and out of any Bank of America account.  In other words, the

transfer of UI benefits into JP Morgan Chase Account 8878 would be processed through a data center in Virginia or Colorado

## Conclusion

56.   Based on the forgoing, there is probable cause to believe that Armeka **THOMAS** and Amaria **HIXON** have committed wire fraud in violation of 18 U.S.C. § 1343, aggravated identity theft in violation of 18 U.S.C. § 1028A, and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, in order to conduct unemployment insurance fraud.

Respectfully submitted,

Elizabeth Messenger, Special Agent
U.S. Department of Labor – Office of
Inspector General

Sworn to before me and subscribed in my presence
and/or by reliable electronic means.

Honorable Elizabeth Stafford
United States Magistrate Judge

Date:   October 2, 2023